**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

IN RE CIDs ISSUED BY UNITED STATES
ATTORNEY'S OFFICE

**PETITION TO SET ASIDE CIVIL INVESTIGATIVE DEMANDS**

Now comes General Medicine, P.C., a Michigan corporation ("General Medicine"), by
undersigned counsel, and for its Petition to set aside certain Civil Investigative Demands
("CIDs"), pursuant to 31 U.S.C. § 3733(j)(2),  states as follows:

**I**
**THE CURRENT CIDS**

**A.  The Purpose of This Petition**

1.      General Medicine is in the business of providing post-acute care facilities with
Post-Hospitalists[1] (physicians and nurse practitioners) that specialize in the near-daily
monitoring and care of post-acute patients by providing care exclusively for patients in nursing
homes, skilled nursing, rehabilitation, assisted living, and other long-term care facilities (who are
typically high-risk and medically complex), thereby reducing overall health care costs by
reducing the number of rehospitalizations and emergency room visits and, at the same time,
improving patient care.

2.      The U.S. Attorney's Office for the Southern District of Illinois ("USAO") has
been investigating General Medicine for possible violations of the False Claims Act for at least
six (6) years, since 2015.

3.      General Medicine learned on July 17, 2020 that North Carolina State Veterans
Home, one of the nursing facilities for which General Medicine provides healthcare services,

---

[1] See, *https://en.wikipedia.org/wiki/Post-hospitalist* [Ex. 24]

including a medical director, physicians and nurse practitioners, was served with a CID issued by

the USAO on July 17, 2020. A copy of this CID is attached as Exhibit 1.

    4.     The CID consists of six (6) interrogatories:

| 1 | Identify by name the General Medicine practitioners who have provided medical services to residents in your facility at any time during the past 12 months. |
|---|---|
| 2 | Have you received any complaints (whether formal or informal) about General Medicine, or a General Medicine practitioner during the past 12 months? If so, please answer the following questions for each complaint:<br>    a.  Who made the complaint?<br>    b.  When was the complaint made?<br>    c.  How was the complaint made?<br>    d.  What was the nature of the complaint?<br>    e.  How was the complaint resolved? |
| 3 | Are resident medications regularly reviewed for dosage, discontinuation, and/or contraindication? If so, please answer the following questions:<br>    a.  Who performs the review?<br>    b.  How is the review performed?<br>    c.  How frequently is the review performed?<br>    d.  How is the review documented?<br>    e.  What role, if any, do General Medicine Practitioners have in the review? |
| 4 | Are resident care plans[2] regularly reviewed? If so, please answer the following:<br>    a.  Who performs the review?<br>    b.  How is the review performed?<br>    c.  How frequently is the review performed?<br>    d.  How is the review documented?<br>    e.  What role, if any do General Medicine practitioners have in the review? |
| 5 | Do you have any concerns about General Medicine or any specific General Medicine practitioners, including any concerns about the frequency of visits, the quality of care being provided, the time spent with residents, or anything else? |
| 6 | Please identify by name and phone number at least one person who either (a) |

---

[2] As phrased, this interrogatory is misleading because the "resident care plan" or "nursing care plan" prepared by the nursing facility is very different from the Care Plan Review/Medicare Cert-Recert performed by General Medicine, which certifies the necessity for various services for the patient by documenting the reasons, medical conditions, orders, patient needs that support the Medicare Cert-Recert ( which must be signed by the physician) for Part A services, and other Medicare services such as hospice, physical therapy, wound care, occupational therapy, speech therapy, dietary including swallowing evaluations. The facility's "resident care plan" contains nursing interventions, created by nurses for the different purpose of implementing orders written by the physician. For example, providing Ensure for nutrition deficit, encouraging fluids for diagnosis of dehydration, etc.

13797053.1

|  | prepared your responses to these questions; or (b) is knowledgeable about your responses to these questions and can be contacted about them, if necessary. |
|--|--|

5.　　The first page of the CID contains the following statement:

"This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns General Medicine, P.C. providers and allegations that false claims were submitted to the Federal Medicare program and state Medicaid programs by upcoding claims for services, billing for services not rendered, and billing for services not medically necessary."

6.　　Similar CIDs have also been served on other nursing facilities served by General Medicine, although the exact number served with this CID is unknown to General Medicine.

7.　　At least one facility served with this CID has interpreted the language of the CID to mean General Medicine is being investigated criminally, rather than civilly.

## B.　The Injury to General Medicine and its Patients

8.　　General Medicine now petitions the Court to set aside the CIDs[3] issued to the facilities because they (1) fail to comply with § 3733's specificity requirements; (2) do not seek information reasonably relevant to an investigation and/or seek information already in possession of the USAO; (3) are overbroad and harassing; (4) were issued in bad faith; and, (5) it would be an abuse of process to enforce the CIDs.

9.　　31 USC § 3733(a)(2)(C) requires that written interrogatories be set forth with specificity.  As set forth herein, at least interrogatories 2 and 5 lack any notion of specificity that could be reasonably related to a False Claims Act investigation.

10.　　In addition, interrogatories 2 and 5 do not request information that could be reasonably relevant to a False Claims Act investigation.  See, e.g, *United States v. Fla. Azalea*

---

[3] A CID is a form of administrative subpoena.  *United States v. Markwood*, 48 F.3d 969, 975 (6th Cir. 1995).

*Specialists*, 19 F.3d 620, 623 (11th Cir. 1994)("As a general rule, an administrative subpoena should be enforced if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant."); see also, *United States v. Markwood*, 48 F.3d 969, 977 (6th Cir. 1995), quoting *United States v. Morton Salt*, 338 U.S. 632, 652-53 (1950)("The gist of the protection is ... that the disclosure shall not be unreasonable.").   Here, the CID seeks general information about which General Medicine practitioners practiced out of the facility, whether any complaints about General Medicine have been lodged, and whether the facility holds any concerns about General Medicine.   These amorphous requests cannot, in any way, be reasonably relevant to a False Claims Act investigation, since none seek information the USAO reasonably believes exists.   In particular, interrogatories 2 and 5, by their very wording, evince the USAO's fishing expedition into General Medicine's business practices upon the unparticularized hopes on finding something wrong.

11.     Interrogatories 3 and 4 appear[4] to ask whether Care Plan Reviews ("CPRs") and Monthly Medication Reviews ("MMRs") are performed at the facility and under what circumstances.   This information regarding CPRs and MMRs has already been provided by General Medicine to the USAO. As detailed below, General Medicine has already provided all General Medicine billing records and a substantial amount of information regarding CPRs and MMRs. These are interrogatories and General Medicine and the facility should not have to produce materials that are already in the USAO's possession.  *Markwood*, 48 F,3d at 980.

12.     Additionally, the CIDs are overbroad and harassing. *Fla. Azalea Specialists*, 19 F.3d at 623; see also, *United States v. Golden Valley Electric*, 689 F.3d 1108, 1113 (9th Cir. 2012). Against the extensive historical backdrop set forth herein, interrogatories 2 and 5 vaguely

---

[4] See footnote 2 above.

seek information plainly not reasonably relevant to a False Claims Act investigation evidences at least one of the USAO's true purposes for issuance: to harass General Medicine and cause harm to its business.  The CID's solicitation of "complaints" or "concerns" it has no reasonable belief exists demonstrates that the USAO will stop at nothing to disrupt General Medicine's business practices. General Medicine continues to lose facilities as the result of these CIDs.

13.     As set forth herein, the CIDs were issued in bad faith, since they were issued for an improper purpose, including to harass and harm General Medicine and to cause General Medicine to settle a collateral dispute.  *In re Administrative Subpoena*, 289 F.3d 843, 846 (6th Cir. 2001), quoting *United States v. Powell*, 379 U.S. 48, 58 (1964)("[A] court's process is abused only if the subpoena is issued for an improper purpose, such as to harass [an investigation's target] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.")(Brackets in original). General Medicine bears the burden of demonstrating institutional bad faith.  *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 314-16 (1978).  The instant CIDs were not issued in a vacuum; instead, they were issued after years and years of General Medicine's cooperation with the USAO and with full knowledge that issuance would harm General Medicine's business.  And rather than being a specific request for information reasonably relevant to a False Claims Act investigation, the CID sought broad, opinion-based responses that could never be relevant to a legitimate investigation.

14.     Where the CID is woefully defective, seeks irrelevant information, was issued in bad faith to harass and harm General Medicine, enforcement of the CID would constitute an abuse of process.  *United States v. Witmer*, 835 F.Supp. 208, 221 (M.D. Penn. 1993), quoting *SEC v. Wheeling—Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3rd Cir. 1981)(When discussing

the framework for evaluating whether to enforce a CID, the court stated, "In other words, the court must determine whether the court's process would or would not be abused by enforcement.").

15.     General Medicine has previously made the USAO aware that prior CIDs served on some of General Medicine's facilities had a detrimental effect upon General Medicine's business relationship with those facilities and its employees who have served those facilities, including the ending of those business relationships and employment relationships, and also had a detrimental effect on the elderly patients General Medicine serves, especially during the current Covid-19 pandemic.

16.     As is discussed further below, General Medicine endeavored to be completely transparent and has fully cooperated with the USAO in its investigation and has offered to provide any information needed in the investigation, emphasizing the detrimental effect the CIDs have on these business and patient relationships and on the elderly patients themselves.

17.     During the six (6) year period this investigation has been conducted by the U.S. Attorney's office, approximately 83% of the facilities served by General Medicine have ended their business relationship with General Medicine and General Medicine has lost over 70% of its staff. Prior to this investigation General Medicine had a less than 6% attrition rate per year.

18.     Recently, a facility served by General Medicine ended its business relationship with General Medicine after being served with a similar CID, citing "ongoing legal proceedings" as the reason for terminating its business relationship with General Medicine. The only "ongoing legal proceedings" regarding General Medicine and this facility was the CID and this ongoing federal investigation.

13797053.1

C.  **General Medicine Has Standing**

19.     General Medicine has not found a reported case which addresses the issue of whether or not the target of an investigation has standing under 31 U.S.C. § 3733(j)(2) to petition the Court for relief from a CID issued to a third-party, so brings this petition based upon a good-faith basis for extension of the law based on the principle of Article III standing in that General Medicine has been, and is being, injured in fact, the injury is fairly traceable to the  Investigation and use of CIDs, and the injury is likely to be redressed  by a favorable judicial decision.

20.     General Medicine recognizes that involvement of the Court in an investigation being conducted by the Government is unusual and atypical. However, as explained herein, the injury and disruption to the business of General Medicine and its ability to serve its elderly patients has been so profound that protection by the Court is necessary. General Medicine has no other means by which it can obtain relief from the injury resulting from the USAO's Investigation.

21.     While General Medicine is not technically the party on whom the CID was served, the bulk of the  information sought by the CIDs will have to be obtained from General Medicine and its employees who serve as Medical Directors, physicians and nurse practitioners, so that the CID is in effect directed, at least in relevant part, to General Medicine. The Medical Director provided by General Medicine is a key member of the administrative team for the nursing home(s) who received the CID and the person who will likely be asked to respond to the CID or provide the information needed to respond to the CID. See Ex. 25, CMS Manual System, Medical Director Guidance.

22.     For example, the facility would have to obtain the information sought in interrogatories 1, 3, and 4 from General Medicine in order to answer those interrogatories.

**D.  The CIDs to the Facilities are Unnecessary and Irrelevant.**

23.     Until recently, the Investigation has focused on General Medicine's performances of CPRs and MMRs on the clients it serves.[5] General Medicine has never disputed that it performs CPRs and MMRs, and bills for those services, which are routinely paid and approved by CMS and other insurance plans.   General Medicine has provided records which show that information and the identity of all the practitioners who provide those services and has provided the USAO with numerous documents explaining these services and why they are performed and included legal and regulatory citations. General Medicine also made thousands of favorable audit and Administrative Law Judge decisions available to the USAO. There is no need for the USAO to seek that same readily available information from the facilities.

24.     Interrogatories 2 and 5 are the definition of a "fishing expedition" on the part of the USAO. After six (6) years of investigating General Medicine, rather than narrowing its investigation, the USAO now casts the broadest net possible by asking the facility whether it  has "*received any complaints*" (interrogatory 2) during the past 12 months and if the facility has "*any concerns about General Medicine*" (interrogatory 5).

25.     These extremely broad interrogatories, 2 and 5, are not relevant to the investigation which, according to the U.S. Attorney's Office, is focused on the performance of CPRs and MMRs by General Medicine.

26.     For example, "*any complaints*" or "*any concerns*" would include complaints a doctor or nurse practitioner is hard to reach, difficult to work with, grumpy, or any other ordinary complaint in the medical workplace, none of which rise to the level of a False Claims Act violation.

---

[5] These CIDs appear to have expanded the Investigation to "any complaints" and "any concerns."

27.     General Medicine seeks the Court's assistance in ending the use of unnecessary CIDs directed to the facilities to obtain information that either can easily be obtained from General Medicine or is not relevant to the scope of the investigation.

**E.   The USAO has been investigating General Medicine under the False Claims Act for approximately six (6) years.**

28.     General Medicine is a Michigan corporation that was formed in 1983 by Dr. Thomas Prose, with its main offices in Novi, Michigan.

29.     General Medicine has been advised by the U.S. Department of Justice Office of the United States Attorney for the Southern District of Illinois ("USAO"), that it is conducting a False Claims Act (31 U.S.C §§ 3729-3733)  Investigation ("Investigation") to determine whether there is, or has been, a violation of 31 U.S.C § 3729 by General Medicine.

30.     While the exact date the Investigation began is not known, each of the CIDs issued by the USAO in this Investigation bears the USA-SDIL file number "2015V00591", suggesting this Investigation may have begun sometime during the year 2015.

31.     If the date 2015 is correct, the Investigation is currently still ongoing, approximately six (6) years after it began, with no apparent end in sight considering these recent CIDs.

**F.   General Medicine has fully cooperated with the investigation.**

32.     General Medicine has received four (4) Civil Investigative Demands ("CID") from the USAO beginning in November 2017, as follows:

   a.     **CID #1 – November 6, 2017**: The USAO made a demand for "complete claims or billing history for all claims or billing history for all claims submitted to any government or private insurance program"…"for the period January 1, 2008 to the present."  (Ex. 2) General Medicine complied with this demand and produced the requested information to the USAO on December 11, 2017, consisting of claims spreadsheets (along with a Claim Entity List and the Headers Description) for all General Medicine claims available on the software program in

use by General Medicine at that time; the remainder of the information was sent to the USAO soon thereafter. This information provided to the USAO included all claims submitted by General Medicine from and after January 1, 2008 and consisted of over 700,000 claims.

b.      **CID #2 – June 5, 2018:** The USAO made a demand for "all e-mails, incoming and outgoing between and among any of the following persons:" (12 employees listed) "for the period January 1, 2012 to the present." (Ex. 3) General Medicine complied with this demand and produced the requested information to the USAO on July 19, 2018 consisting of 63,732 un-redacted e-mails, including privileged attorney-client communications. Following General Medicine's management review of these 63,732 un-redacted e-mails, General Medicine is unaware of any e-mails indicating any violation of the False Claims Act;  In fact the emails demonstrate an unwavering commitment to following all applicable laws.

c.      **CID #3 – October 15, 2018**: The USAO made a demand for "your complete medical records, including but not limited to, admission/readmission notes, monthly medication reconciliation notes, care plan review notes, annual wellness visit notes, Medicare certification/recertification notes, Physician Quality Reporting System forms, assessments, progress notes, orders, prescriptions, and any other notes related to encounters, for the following patients:" (70 patients listed) "for the period January 1, 2010 to the present." (Ex. 4) In response to a letter from General Medicine's counsel, USAO withdrew this CID in response to a letter from General Medicine's counsel sent October 26, 2018 (Exs. 5, 11);

d.      **CID #4 – February 4, 2019**: The USAO made a demand for "your complete medical records, including but not limited to, admission/readmission notes, monthly medication reconciliation notes, care plan review notes, annual wellness visit notes, Medicare certification/recertification  notes, Physician Quality Reporting System forms, assessments, progress notes, orders, prescriptions, and any other notes related to encounters, for the following patient encounters:" (100 patients listed) "for the period  January 1, 2013 to the present." (Ex. 6)

Fifty of these requests were for pre-EHR (electronic health records) documents which were kept at the various facilities in hard copy form. Fifty requests were for EHR records which could be easily and quickly produced by General Medicine. General Medicine offered to send employees to the facilities to retrieve the non-EHR records, or, in the alternative, produce 50 additional EHR records, whichever the USAO preferred. The USAO indicated General Medicine only needed to produce the 50 EHR records it had requested. The USAO then,

unnecessarily, served CIDs on the facilities for the non-EHR records, despite the fact the USAO had been advised of the seriously detrimental effect the CIDs were having on the relationship between General Medicine and its facilities and patients.

33.    In addition to the foregoing, General Medicine, endeavoring to be completely transparent, has voluntarily provided the USAO with a large amount of additional documents and information not requested by the USAO, including:

a.    **The General Medicine Compliance File**: This is a digital file maintained by General Medicine for the purpose of documenting compliance issues and its proactive response to those issues. This digital file consists of almost 13,000 pages. This file was voluntarily produced to the USAO, without demand and with no redactions of privileged attorney client communication, on January 25, 2018;

b.    **Employee Training Records**: These are records of training provided to employees of General Medicine regarding compliance issues. These records were voluntarily produced to the USAO, without demand, on January 25, 2018. These records were preceded by a letter to the USAO on December 21, 2017 (Ex. 7) explaining that employee training is an important part of the General Medicine Internal Compliance Program and includes specific instruction in four risk areas identified in the OIG guidance (Coding and Billing; Reasonable and necessary medical services; Proper documentation; and Improper inducements, kick-backs, and self-referrals). General Medicine uses CMS WBT training courses for the annual training of all of its employees;

c.    **Unfettered Access to General Medicine's Billing Staff:** When General Medicine learned the USAO was contacting former General Medicine billing staff, General Medicine invited the USAO to come to General Medicine's offices in Novi, Michigan and interview the billing staff without counsel present. General Medicine even arranged for a long-time former billing person to present herself for an interview. During the interviews, the USAO asked to interview two management employees and were permitted to do so, without counsel present.

13797053.1

21. __Physician's Patient Encounter Records at Particular Nursing Home__: Dr. Greene is an employee of General Medicine who was assigned to see residents at Mar-Ka nursing home. When it was learned that Mar-Ka nursing home did not have any of the patient encounter records for this physician for a period of time (although surprisingly the nursing home had General Medicine Nurse Practitioner records for the same time period, which were sent to the nursing home in the same file as the physician encounter records), General Medicine voluntarily, and without demand, provided the USAO with those patient encounter records that were missing from the nursing home;

d. __A Letter of Explanation with Additional Documentation (4-23-18)__: On April 23, 2018, the USAO was provided with a 24-page letter of explanation of various issues and additional documentation not requested by the USAO. (Ex. 8);

e. __A Letter of Explanation with Additional Documentation (7-19-18)__: On July 19, 2018, the USAO was provided with a 23-page letter of explanation of various issues and 226 pages of additional documentation not requested by the USAO. (Ex. 9);

f. __A Letter of Explanation with Additional Documentation (11-13-18)__: On November 13, 2018, the USAO was provided with an 11-page letter of explanation of various issues and additional documentation not requested by the USAO. (Ex. 28).

g. __An Offer to round with or shadow General Medicine clinicians:__ General Medicine has offered the permit representatives of the USAO to round with or shadow General Medicine clinicians and observe first-hand how they perform their duties. This would be similar to the rounding or shadowing by OIG attorneys during a prior investigation, explained herein. The USAO has not yet accepted this standing offer.

34. In addition, as part of its ongoing Investigation the USAO has:

a. Tracked the vehicle of a General Medicine Nurse Practitioner from June 2, 2017 through July 7, 2017, using a tracking device;

13797053.1

b.      Tracked the vehicle of a General Medicine Physician from August 4, 2017 through September 8, 2017, using a tracking device;

c.      Obtained surveillance video from several nursing care facilities where General Medicine employees provide services;

d.      Obtained copies of medical records of residents from several nursing care facilities where General Medicine employees provide services.

35.     The USAO has never asserted that General Medicine has not been completely cooperative or that General Medicine's production of documents and information has been incomplete.

## II

## THE PREVIOUS GENERAL MEDICINE FALSE CLAIMS CASE

36.     General Medicine was previously investigated in a False Claim Act *qui tam* action with the Office of the U.S. Attorney for the Eastern District of Michigan which began in 2002

37.     The lengthy investigation in that case involved several FBI subpoenas and the production of many thousands of pages of documents by General Medicine, including about 46 banker boxes of documents.

38.     Ultimately, that extensive, thorough and lengthy *qui tam* investigation found –

- <u>No</u> upcoding;
- <u>No</u> billing for services not rendered;
- <u>No</u> billing for services not medically necessary; and
- <u>No</u> unbundling;
- <u>No</u> indication that CPRs[6] and MMRs[7] were medically unnecessary, illegal, or "worthless."

---

[6] "CPR" is a "Care Plan Review" is performed monthly by a physician or nurse in a face-to-face encounter with the patient for a number of reasons explained below, including a determination of whether to certify the need for the patient to remain in the long-term care facility and receive Medicare Part A, B and D services.

[7] "MMR" is a "Monthly Medication Review/ Reconciliation/Reorder" which is performed by a physician or nurse practitioner for a number of reasons explained below, including a review of all medications prior to ordering the patient's medications from the pharmacy.

39.     The only violation the USAO for the Eastern District of Michigan found was General Medicine had not obtained individual provider numbers for its nurse practitioners in a timely manner. However, General Medicine had obtained provider numbers for its nurse practitioners several years before it became aware of the False Claim Act investigation in 2005. The USAO asserted that these numbers should have been obtained earlier than they were.

40.     From 2010 through the present, General Medicine has been the subject of approximately 5,000 Medicare audits.

41.     Pursuant to a 2009 Corporate Integrity Agreement entered into with the Government, Annual Audits were conducted from 2010- 2014 and accepted each year, with General Medicine being found fully compliant.

42.     In 2011, federal OIG attorneys performed a site visit at a General Medicine facility:

> a.      Nine out of the ten clinicians (90%) interviewed during the 2011 OIG attorney site visit are included in the 70 patients listed in the CID of October 15, 2018;
>
> b.      Twenty of the 43 CID facilities (43%) represented in the CID of October 15, 2018 are covered by the nine clinicians interviewed by the OIG attorneys in 2011;
>
> c.      In 2011 the OIG attorneys interviewed 44% of all clinicians;
>
> d.      The OIG attorneys interviewed clinicians and managers, including Dr. Prose, without legal counsel, or anyone else including managers, present.  The OIG attorneys were able to ask anything without interference from anyone, and are believed to have inquired about correct coding, medical necessity, and billing

14

only for services rendered, and practice patterns, which would include CPRs and MMRs.

e.      During the OIG site visit, OIG attorneys rounded or followed along with a General Medicine physician and observed his evaluations, examinations, documentation and other procedures utilized when examining, treating, documenting, and coding or billing for the services.   They offered no criticism or suggested modifications to his professional services and billing.

f.      The OIG did not render any findings of lack of training or billing for medically unnecessary services, upcoding, unbundling, or billing for services not rendered.

g.      The OIG attorneys did not suggest that MMRs or CPRs were medically unnecessary, illegal, unbundled, or "worthless."

h.      The OIG proposed additional steps, which General Medicine immediately implemented and confirmed in writing to the OIG.  The additional steps included referencing HHS/OIG/CMS in training compliance, adding "Compliance is important to us" stickers to name badges, Stark and Anti-kickback training provided to Sales staff, General Medicine was added to OIG email distribution list, and the CIA is included in employee manual and inservices.

General Medicine has about a 99.98% success rate in appeals before Administrative Law Judges for decades, including several recent ALJ decisions.

## III

## THE ISSUES CURRENTLY BEING INVESTIGATED BY THE USAO

### A.  General Medicine's efforts to understand the scope of the investigation and the issues being investigated.

43.     Various letters sent on behalf of General Medicine to the USAO, which are attached, demonstrate repeated efforts by General Medicine to determine and understand the specific issues being investigated by the USAO and to thereby to be completely transparent and provide the USAO with useful information and explanations regarding those issues for the purpose of resolving this matter.

44.     Each of the CIDs issued to General Medicine by the USAO (Exs. 2, 3, 4, 6) contains the same general boilerplate language to describe the scope of the investigation:

> "*The False Claims Act investigation concerns General Medicine, P.C providers and allegations that false claims were submitted to the Federal Medicare program by upcoding claims for services, billing for services not rendered, and/or billing for services not medically necessary.*"

45.     The word "or" is not included in the CID February 4, 2019 (Ex. 6), likely in response to General Medicine's assertion in its October 26, 2018 letter (Ex. 5) that the use of the word "or" indicated the possibility that only one or two, but not all, of the issues identified in the CID were being investigated.

46.     The boilerplate language used by the USAO in the CIDs was too general and broad to permit an understanding of the precise focus of the Investigation.

47.     The various letters to the USAO, which are attached, demonstrate repeated attempts by General Medicine to discover precisely what the USAO believed General Medicine was doing, or failing to do, that would constitute a violation the False Claims Act so that General Medicine could directly and meaningfully respond to those concerns.

13797053.1

**B.** **The USAO, for the first time in the twenty-three (23) years General Medicine has been performing CPRs and MMRs, challenges the legality of performing these encounters.**

48.     In its letter of November 5, 2018, about a year after General Medicine learned of the Investigation, the USAO provided some insight to General Medicine regarding what it believed General Medicine was doing that was not legal. (Ex. 10) There the USAO first essentially repeated the general allegations from the CIDs –

> "*We have reason to believe that General Medicine has knowingly up-coded claims for services rendered, submitted claims for services that were not rendered, unbundled services to artificially generate additional revenue, and billed federal insurers for services that were not medically necessary.*"

49.     In that same letter, the USAO then provided an explanation of the specific focus of the Investigation that General Medicine had been seeking:

> "*We are especially focused on the so-called "regulatory visits", including the MMR and the CPR, which General Medicine has consistently billed (and continues to bill) as complex subsequent nursing home evaluation and management encounters (CPT 99310).*"

50.     Based upon the assertions in this letter, General Medicine believes the USAO's Investigation is focused on the legality of performing, and billing for, a **CPR** (**Care Plan Review**) and an **MMR** (**Monthly Medication Review/Reconciliation/Reorder**), which are explained and discussed in detail below.

51.     In its November 5, 2018 letter, the USAO advised General Medicine:

> "*We are aware of no regulation that requires each of those services to be provided to each nursing home resident every month, particularly when the residents are already being seen regularly by General Medicine practitioners and other medical providers for acute visits and other needs.*" Ex. 10.

52.     The USAO then, without citation of any authority or legal basis, asserted:

*"The vast majority of these encounters appear to be medically unnecessary, duplicative of other services the patient is already receiving from other sources, and essentially **worthless**."* (Emphasis added)

53.     With respect, the USAO is incorrect; the performance of the CPRs and MMRs is legal, medically necessary for the care and well-being of the patient, improves the quality of care, reduces the cost of health care to elderly patients and the USAO, and are far from "worthless."

### C. On March 30, 2020, the USAO sent a second letter outlining the purpose of its Investigation.

54.     47. The UAOAO sent a second letter to counsel for General Medicine on March 30, 2020 addressing the purpose of its long Investigation, exposing a shift in the USAO's position.

55.     48. The gist of this letter is the USAO believes "General practice of performing monthly CPRs and MMR for all patients, and billing those encounters at the highest possible CPT code violates the False Claims Act by knowingly presenting false claims for services that are not medically necessary and/or upcoded."

### D. This Investigation is the first time it has been suggested that CPRs and MMRs are "worthless" since General Medicine began performing them more than 23 years ago.

56.     There is no factual dispute as to whether General Medicine practitioners have performed, and billed for, CPRs and MMRs for more than 23 years. There is no need to investigate that factual issue. General Medicine admits its practitioners perform CPRs and MMRs, as required by law. The sole issue involved is an issue of law regarding the legality and appropriateness of performing a CPR and an MMR.

18

57.    General Medicine practitioners have performed thousands of CPRs and MRRs during the past 23 years without any previous indication by anyone else these services are not medically necessary, duplicative of other services, or "worthless."

58.    Despite a history of thousands of audits and Administrative Law Judge decisions, this November 5, 2018 letter from the USAO is the first, and only, occasion any agency, department, official, contractor of the Government has ever challenged the legality or appropriateness of General Medicine performing, and billing for, a CPR or an MMR.

59.    Although there have been audits which have challenged the coding of a particular claim on a subjective basis, General Medicine has never had a single MMR or CPR claim denied as not medically necessary or unbundled.

60.    General Medicine has been performing these MMRs and CPRs in the same manner and with the same frequency for the past 23 years.

61.    Thousands of pre-payment audits and post-payment audits by numerous Medicare contractors for those 23 years, from 1995 through the present, have included MMRs and CPRs.

62.    In thousands of audits of MMRs and CPRs during those 23 years, General Medicine has never had a MMR or CPR denied as non-billable or deemed medically unnecessary or inappropriate or unbundled under Medicare regulations or "worthless."

63.    General Medicine has had approximately 1,509 favorable decisions regarding CPRs and MMRs from Administrative Law Judges , including several recent Administrative Law Judge decisions regarding CPRs and MMRs

64.    General Medicine has never had an unfavorable ALJ decision denying CPRs or MMRs as medically unnecessary, unbundled, duplicative, or a violation of the law or "worthless."

13797053.1

65.     ALJs have always approved CPRs and MMRs as services that are required by Medicare.

66.     In each instance where challenged claims have been heard by an ALJ, the claim has been approved.

67.     In 1996, prior to implementing the use of the standard Progress Note and Definition Sheet, by General Medicine Clinicians, Dr. Thomas Prose (President of General Medicine) sent a letter to the Department of Health & Human Services, Health Care Financing Administration (HCFA), predecessor to Centers for Medicare and Medicare Services (CMS), seeking guidance regarding the use of the form, which was approved by HCFA. (Ex. 21)

68.     Later, in 2000, Dr. Prose again sought guidance from HCFA regarding use of the Care Plan Review form, the use of which was approved by HCFA. (Ex. 22)

69.     On December 14, 2018, counsel for General Medicine met with the USAO and followed up with a lengthy letter from counsel dated December 21, 2018 further explaining to USAO the legality, necessity and appropriateness of performing CPRs and MMRs. (Ex. 11)

**IV**
**CARE PLAN REVIEWS (CPR)**

**A.  Federal Regulations and Medicare Guidance require recertification every 30 days**

70.     As explained in further detail below, General Medicine practitioners (physicians and nurse practitioners) provide services exclusively to residents/patients of skilled nursing facilities (SNF) and nursing facilities (NF).

71.     In order for the nursing facility to be paid for extended care services to the patient and for the patient to remain in the long-term care facility, the physician/nurse practitioner must

sign a certificate every 30 days recertifying the continued need for nursing services for each patient using a "Certification of Need for Extended Care Services/Post Acute" ("Certification").

72.    Section 40 of the "Medicare Guidance for Certification and Recertification for Hospitals and Extended Care Services" provides, in part:

> "Payment for covered post-hospital extended care services may be made only if a physician (or, as discussed in §40.1 of this chapter, a physician extender[8]) makes the required certification, and, where the services are furnished over a period of time, the required recertification regarding the services rendered."

73.    Section 40.4 of that Medicare Guidance provides, in part:

> "The first recertification must be made no later than the 14th day of inpatient extended care services. A skilled nursing facility can, at its option, provide for the first recertification to be made earlier, or it can vary the timing of the first recertification within the 14-day period by diagnostic or clinical categories. Subsequent recertifications must be made at intervals not exceeding 30 days. Such recertifications may be made at shorter intervals as established by the utilization review committee and the skilled nursing facility."

74.    Recertification is not simply a matter of signing a form; rather, as stated in Section 40.3 of Exhibit 14:

> "The recertification statement must contain an adequate written record of the reasons for the continued need for extended care services, the estimated time required for the patient to remain in the facility, and any plans, where appropriate, for home care. The recertification statement made by the physician does not have to include this entire statement if, for example, all of the required information is in fact included in the progress[9]."

75.    42 C.F.R. § 483.30(b) explains the importance of these reviews/visits:

> "The intent of this regulation is to have the physician take an active role in supervising the care of residents.  This should not be a superficial visit, but should

---

[8] A Nurse Practitioner is included as a "physician extender."

[9] "Progress" refers to the physician's progress note, which is the medical documentation of the patient encounter. General Medicine refers to this document as a "Care Plan Review." The full title is Medical Director/Physician: History/Physical Assessment and Care Plan Review / Medicare Certification/Recertification /Medication Reconciliation

include an evaluation of the resident's condition and a review of and decision about the continued appropriateness of the resident's current medical regime. (Ex. 12[10])

76.     Also, 42 C.F.R. § 483.30 explains: "'Must be seen' means that the physician must make actual face-to-face contact with the resident." (Ex. 12)

**B.  General Medicine complies with the certification/recertification requirements by performing monthly CPRs.**

77.     Upon information and belief, there are physicians who recertify nursing home patients for continued care without actually seeing, examining and evaluating the patient or even back date the recertification. General Medicine physicians and nurse practitioners are not permitted to do this; as explained in the Employee Manual, they must see, examine and evaluate the patient before completing the certification.

78.     In order to meet the Government requirements for the recertification of extended care patients and to ensure proper examination and evaluation of the patient, General Medicine physicians and nurse practitioners must perform a monthly Care Plan Review (CPR) in order to properly evaluated the patient and verify and document that patient's actual need for further nursing care services and all other Part A services, and all other Medicare services such as hospice, physical therapy, wound care, occupational therapy, speech therapy, dietary prior to signing the recertification.

**C.  The General Medicine Employee Manual explains how to perform a CPR.**

79.     The General Medicine Employee Manual provides guidance to employees regarding the proper performance CPRs in order to ensure compliance.  (Ex. 13)

80.     Section 5 of page 42 of the Employee Manual explains that the CPR is done monthly and is counted as separate from acute-care visits. Section 5 explains the purpose of the

---

[10] The reference in the document to 483.40 should be to 483.30.

CPR and emphasizes that the physician/nurse practitioner must have face-to-face contact with the patient in order to perform the CPR.

### D. **General Medicine sought, and obtained, Government approval for CPRs.**

81.     In 1996, prior to implementing the use of the standard Progress Note and Definition Sheet, by General Medicine Practitioners, Dr. Thomas Prose (President of General Medicine) sent a letter to the Department of Health & Human Services, Health Care Financing Administration (HCFA), predecessor to Centers for Medicare and Medicare Services (CMS), seeking guidance regarding the use of the form, which was approved by HCFA. (Ex. 21)

82.     Later, in 2000, Dr. Prose again sought guidance from HCFA regarding use of the Care Plan Review form, the use of which was approved by HCFA. (Ex. 22)

83.     The form used by General Medicine to complete the CPR was specifically approved by several Administrative Law Judges.   A representative instance of these decisions is the decision by ALJ Lewis in Appeal No. 1-45171111. A copy of this decision is attached as Exhibit 20.   In his decision ALJ Lewis noted the following:

> a.     General Medicine performed evaluations utilizing checklist forms it has developed.
> b.     The checklist form is annotated extensively by the physician, showing a detailed history, a comprehensive examination and medical decision making of moderate to high complexity.
> c.     The form at issue in these claims is appropriate for identifying numerous conditions for each beneficiary, and any pertinent elements for each illness.
> d.     Each individual claim contains a three-page document entitled "Medical Director/Physician" History/Physical Assessment and Care Plan Review" for the respective dates of service at issue in each claim.
> e.     Each history and assessment document in each claim reflects the examination was performed on multiple body areas and/or organs, and includes a comprehensive/expanded examination as set forth above.
> f.     The appellant (General Medicine) has provided sufficient documentation to show that the evaluation and management services at issue were reasonable and necessary.
> g.     Having met the documentation requirements, the claims are fully medically reasonable and necessary

**E.  General Medicine refuses to sign the Certification without examining and fully evaluating the patient and properly documenting that encounter, because to do so would be improper and illegal.**

84.     The signing of the monthly Certificate without performing the CPR to verify the actual need for further services has been recognized by OIG to be fraudulent.

85.     The Office of the Inspector General issued a ***Special Fraud Alert*** in  January 1999 (*https://oig.hhs.gov/fraud/docs/alertsandbulletins/dme.htm*) stating:

> "Improper Physician Certifications Foster Fraud. Unscrupulous suppliers and providers may steer physicians into signing or authorizing improper certifications of medical necessity. In some instances, the certification forms or statements are completed by DME suppliers or home health agencies and presented to the physician, who then signs the form without verifying the actual need for the items or services." (Ex. 15, p. 4)

And,

> "Physicians should also be aware that they are subject to substantial criminal, civil, and administrative penalties if they sign the certification knowing that the information relating to medical necessity is false, or with reckless disregard as to the truth of the information being submitted." (Ex. 15, p. 1)

86.     General Medicine refuses to engage in the practice described in paragraph 77 above, but instead requires compliance by its physicians and nurse practitioners, who must actually examine and evaluate the patient before they verify and document the need for the services provided by the nursing facility by performing the CPR before completing the certification.

**V**
**MONTHLY MEDICATION REVIEWS/RECONCILIATION/REORDER (MMR)**

**A.  MMRs are performed in order to review and renew the patient's medication each month.**

87.     The General Medicine physician/nurse practitioner is required to review and renew the medications by signing the physician order sheet for each skilled nursing facility "SNF" or nursing facility "NF" patient on a monthly basis in order for the pharmacy to provide those medications for the patient.

88.     An MMR is medically necessary because it must be performed by General Medicine Clinicians or the patient's medication will not be renewed.

89.     If the medication is not renewed, all treatment orders and all medications for the patient would be discontinued.

90.     Since November 28, 2017, PRN[11]  orders for psychotropic and antipsychotic medications are required to be renewed every 14 days.  42 C.F.R. § 483.45(e).

91.     In order to properly evaluate and renew a patient's medications, General Medicine performs a Monthly Medication Review/Reconciliation/Reorder ("MMR").

92.     The completion of the MMR provides necessary oversight of the patient's medications, a check and balance, to ensure the patient is receiving only the necessary, therapeutically effective, proper medications and proper dose of each medication and to monitor the nursing home staff for possible medication errors.

93.     The Joint Commission is an independent, not-for-profit organization, accrediting and certifying nearly 21,000 health care organizations and programs in the United States.

---

[11] From the Latin "*pro re nata*", as needed.

94.     According to the Joint Commission:

"Medication reconciliation is the process of comparing a patient's medication orders to all of the medications that the patient has been taking. This reconciliation is done to avoid medication errors such as omissions, duplications, dosing errors, or drug interactions. It should be done at every transition of care in which new medications are ordered or existing orders are rewritten. Transitions in care include changes in setting, service, practitioner, or level of care. This process comprises five steps: (1) develop a list of current medications; (2) develop a list of medications to be prescribed; (3) compare the medications on the two lists; (4) make clinical decisions based on the comparison; and (5) communicate the new list to appropriate caregivers and to the patient."

[The Joint Commission. Medication Reconciliation. Sentinel Event Alert. 2006. http://www.jointcommission.org/SentinelEvents/SentinelEventAlert/sea_35.htm.]

95.     As noted in the article "*Systematic Review of the Prevalence of Medication Errors Resulting in Hospitalization and Death of Nursing Home Residents*", The American Geriatrics Society (2106):

"Medication errors (MEs) result in preventable harm to nursing home (NH) residents and pose a significant financial burden." (Ex. 23, p. 433)

Medication-related events are common in the care of NH residents. MEs involved 16% and 27% of residents. (Ex. 23, p. (439)

"Adverse drug events (ADEs) in long-term care or nursing homes (NHs) occur at an estimated rate of 1.2-7.3 per 100 resident-months, with an annual cost of $7.6 billion in the United States alone. (Ex. 23, p. 433)

96.     MMRs help reduce the number of patient rehospitalizations, saving the Government money; as explained in the *Geriatrics Review Syllabus* for July 2018 (Ex. 18, p. 3):

"Five conditions account for most (78%) of these rehospitalizations: congestive heart failure, respiratory infection, sepsis, and electrolyte imbalances. Polypharmacy and a lack of thorough medication reconciliation have also been found to contribute to higher readmission rates, especially 1-7 days after discharge from an acute-care setting." (Emphasis added).

13797053.1

**B.** **This is the first, and only, time the legality of performing an MMR has ever been questioned or characterized as "worthless".**

97.    General Medicine has been performing MMRs for the past 23 years without any indication from Medicare auditors, ALJs, the U.S. Attorney's Office in the Eastern District Michigan, OIG attorneys during their site visit, or any other Government department, agency, official, contractor or anyone else that performance of an MMR is medically unnecessary, unbundling, duplicative, in any a violation of the law, or "worthless".

**C.** **General Medicine refuses to order or reorder a patient's medicine without examining and evaluating the patient and the patient's medications because to do so would be improper (malpractice) and illegal.**

98.    While isolated healthcare providers may be willing to sign off on the medications each month without actually examining and evaluating the patient, General Medicine will not reorder or certify that medications are appropriate and necessary for a patient without actually examining and evaluating the patient's current medical condition and medication needs. Additionally, General Medicine clinicians review the MAR (medication administration record) to determine whether the patient is receiving the medication as ordered including correct medication, correct dose, and correct frequency.   This is important to reduce medication errors, which are very common in SNF/NFs.

99.    One of the reasons for this monthly review of medications is the regulatory requirement that nursing home patients' medication regimens must be free of unnecessary drugs:

**(d)** *Unnecessary –drugs - General*. Each resident's drug regimen must be free from unnecessary drugs. An unnecessary drug is any drug when–used -

**(1)** In excessive dose (including duplicate drug therapy); or

**(2)** For excessive duration; or

**(3)** Without adequate monitoring; or

**(4)** Without adequate indications for its use; or

27

(**5**) In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or

(**6**) Any combinations of the reasons stated in paragraphs (d)(1) through (5) of this section.

42  C.F.R. § 483.45(d)

100.     The importance of reviewing the patient's medications to eliminate unnecessary medications is explained in the *Geriatrics Review Syllabus* for July 2018 (Ex. 18, p. 6):

> "Additional regulations require medication reviews at regular intervals and that each resident's medication regimen includes no unnecessary drugs. Clinical documentation must demonstrate the indication for all drugs, especially psychoactive medications. Unnecessary medications are those given without indication, at excessive dosages, for excessive, for excessive duration, without adequate monitoring, or when there has been a significant adverse event."

101.     In addition, the facility (in this case, the physician/nurse practitioner) are required by regulation to control medication errors:

(f) *Medication errors*. The facility must ensure that its –

(1)  Medication error rates are not 5 percent or greater;

(2) Residents are free of any significant medication errors.

42 C.F.R. § 483.45(d)

**D.  General Medicine performs the MMR in a face-to-face encounter and examination of the patient in order to ensure compliance.**

102.     General Medicine provides these instructions to practitioners regarding performance of an MMR.

a.     The performance of the MMR must take place in a face-to-face setting with the patient and include physical examination and a full review of the patient's medications for possible side effects, gradual dose reduction and the benefit of use.

28

b.      The MMR visit must include a review of chronic conditions and diagnoses, a review of the patient's systems and vital signs, a review of the medication history, and a physical examination.

c.      One of the specific focuses of the MMR is to review the need for PRN (as needed) medications with a goal of reducing medications to reduce cost for the facility and patient (and, in turn, the Government).

d.      For example, during the MMR, a review is conducted of blood sugars and blood pressure to make sure the proper dose of medications is being administered.

103.    Only after this examination and assessment is properly completed will General Medicine reorder and certify that all medications being ordered from the pharmacy, and subsequently administered to the patient, are necessary.

**E.  An MMR, like a CPR, is very different from an acute care visit.**

104.    The process and purpose of a medication review visit is markedly different from an acute-care visit, which occurs only when needed and is focused on acute medical problem, for example, pneumonia.

105.    An acute-care visit addresses a specific issue or issues and includes the examination, evaluation, treatment, and documentation of any changes in a patient's condition.

106.    The acute-care visit is problem focused and usually time consuming in order to provide proper medical management of the patient's acute illness.

107.    Furthermore, the acute problem may not coincide with or occur on the same day or time that the medications require renewal.

108.    The Monthly Medication Review/Reconciliation/Reorder (MMR) visit consists of a very different process and purpose, which is to review the entire pharmaceutical treatment plan

for the patient, including monthly pharmacy recommendations and then adjust, modify, discontinue, and/or renew all medications and includes and examination and evaluation of all patient diagnoses.

109.    In contrast to the acute-care visit which focuses only on acute problems, the focus in a MMR is all of the patient's chronic conditions and the patient's medication needs, which change and fluctuate, must be assessed and correlated.   For example, if blood sugars are rising, insulin is increased.

110.    The other purpose of the MMR is a review of the MAR (medication administration record) to determine whether the patient is receiving the medication as ordered including correct medication, correct dose, and correct frequency.   This is important to reduce medication errors, which are very common in SNF/NFs.

111.    Recent additional regulations which include a requirement for dose reduction for anti-psychotics and a requirement that "PRN" medications must be renewed every two weeks, have increased the importance of performing the MMR on a monthly basis.

F.   **The performance of the MMR is medically necessary.**

112.    On December 30, 2004, The Lewin Group issued a paper prepared for CMS.

113.    At pages 3 and 4 of the Lewin Group paper it is noted that the Government recognizes the importance of the special needs of nursing home patients for more intensive medication management and that standards of practice are designed to fulfill Federal mandates to decrease medication errors and adverse drug events, assure proper medication selection, monitor drug interactions, over-medication, and under-medication, and improve the documentation of medication administration; this is precisely both the purpose and result of the monthly MMRs performed by General Medicine.

114.    The Lewin Group paper further notes at pages 4 and 5 that a "Resident's drug therapy must be free from unnecessary medications, those given in excessive doses, in excessive duration, or without adequate monitoring" and that "Nursing facilities must ensure that the medication error rate does not exceed five percent."

115.    In a 2016 study by the American Geriatrics Society Medication Errors were common, involving 16–27% of residents in studies examining all types of Medication Errors and 13–31% of residents in studies examining transfer-related Medication Errors, and 75% of residents were prescribed at least one Potentially Inappropriate Medication.

116.    While a licensed pharmacist plays a limited role in patient medication issues, such as providing consultation, counseling, review of medications, and keeping records of medications, the licensed physician also plays an important role in the nursing facility medication process because only a physician is licensed (or, in some cases, a Nurse Practitioner) to prescribe medication, discontinue medication or modify dosages and frequency of administration of medication. That important role is fulfilled by performance of the MMR.

117.    The physician's role in a nursing facility was explained an article entitled "Role of the Attending Physician in the Nursing Home", published through the New York State Department of Public Health, under the heading "Regulatory Visits- Physician Responsibilities" (Ex. 16):

> "The attending physician should…periodically review all medications and monitor for both continued need based on validated diagnosis or problems and for possible adverse drug reactions. The medication review should consider observations and concerns offered by nurses, consultant pharmacists and others regarding beneficial and possible adverse impacts of medications on the patient. "

118.    A 2018 article by Dr. Jerry H. Gurwitz MD, Chief of Geriatric Medicine, University of Massachusetts Medical School, explains the importance of physician involvement

in the medication process in nursing facilities and the purpose of the medication review by the physician, noting:

> "Communication problems are prevalent in the nursing home setting, where many medical decisions are often made over the telephone, in the context of very brief conversations between the nursing staff and the physician or nurse practitioner. Many prescribing and monitoring errors stem directly from inadequate information at the time of ordering, including information about relevant medical conditions, concurrent medications, potential drug interactions, and pertinent laboratory test results. These difficulties are compounded by the complexity of medication regimens, the involvement of multiple covering providers with little knowledge of the patient, and an underdeveloped health information technology infrastructure, limiting the ability of the prescriber to access key information about the resident off-site."

Far from being "worthless", as the USAO asserts, the MMR is crucial to the proper patient care and treatment, regulatory compliance, and to reducing costs for the Government by eliminating unnecessary medications.

## VI

### THE INVESTIGATION IS DETRIMENTAL TO GENERAL MEDICINE, THE ELDERLY PATIENTS IT SERVES AND OTHERS

**1.  This lengthy investigation has had, and is having, a detrimental effect on General Medicine, its employees, the nursing facilities and most importantly, the elderly patients it serves at a time when COVID is ravaging nursing homes nationwide.**

119.    The USAO previously served CIDs requesting records directly from 59 nursing facilities in numerous states served by General Medicine, which illustrates the problems this lengthy investigation is causing for General Medicine and the elderly patients it serves.

120.    On February 4, 2019, the USAO served General Medicine with its fourth CID requesting from "January 1, 2013" to the present for 100 General Medicine patients requesting "complete medical records, including but not limited to, admission/readmission notes, monthly medication reconciliation notes, care plan review forms and notes, annual wellness visit notes,

care plan certification/recertification notes, Physician Quality Reporting System forms, assessments, progress notes, orders, prescriptions, and any other notes related to encounters" for patients located in various facilities in several different states.  (Ex. 6).

121.    In response to this CID, counsel for General Medicine communicated with the AUSA conducting the investigation and advised him that the requested records for 50 of the 100 patients could be quickly produced because they were maintained in electronic form in the HealthFusion data program (Electronic Health Record software implemented by General Medicine in 2017), but the requested records for the remaining 50 records would have to be obtained from each facility by sending a General Medicine staff person to that facility to copy those records. (Ex. 17)

122.    General Medicine expressed its willingness to fully comply with the CID and offered to send staff to obtain and copy the records from the facilities, or in the alternative offered to supply records for 100 patients using the readily available HealthFusion data. (Ex. 17)

123.    The USAO responded by asking General Medicine to provide records for only the 50 patients who were included in the HealthFusion data, stating the USAO would "simply forgo that portion of the CID" for the 50 patients who were not included in the HealthFusion data, stating there was "No need to contact individual nursing facilities to request the records identified in part a." (Ex. 17)

124.    General Medicine complied with the modified CID by sending the HealthFusion data for 50 patients to the USAO on or about February 19, 2019 and, relying on the representation that the USAO would "simply forgo that portion of the CID" for the 50 patients who were not included in the HealthFusion data, did not retrieve the remainder of the originally requested records which it had offered to obtain and produce.

13797053.1

125.     Thereafter, General Medicine learned the USAO had issued CIDs directly to the 59 nursing facilities in numerous states requesting medical records for General Medicine patients, including both the 50 patients General Medicine had offered to retrieve from the facilities and the 50 patients who were included in the HealthFusion data for whom General Medicine previously provided records

126.     There were two reasons General Medicine offered to obtain those records: 1) to comply with the CID and continue to cooperate with the USAO, and 2) to avoid unnecessary disruption of its relationship with these facilities and the elderly patients it serves.

127.     As a result of the USAO's service of these CIDs directly on the 59 facilities, the relationship between General Medicine and of some facilities it serves has been unnecessarily disrupted, including, in numerous cases, the termination of that contractual relationship by the facility. Between 2015 and the present, General medicine has lost 379, or 83%, of its facility clients.

128.     Further, General Medicine has experienced serious staffing issues as a result of the investigation, including 70% of its staff leaving the employ of General Medicine, and difficulty recruiting new staff.

129.     The foregoing ultimately translates into difficulties providing elderly patients with the quality care to which they are entitled and patients losing their personal physician who cared for them for many years.

## VII

## GENERAL MEDICINE'S PRACTICES SAVE THE GOVERNMENT MONEY

130.     General Medicine's practices, including performing CPRs and MMRs on its SNF/NF patients each month, reduce the number of hospitalizations and emergency room visits

of those patients, saving the Government massive sums of money on hospital and emergency room charges.

131.   Illinicare/Centene, a national Medicare/Medicaid managed care plan advised General Medicine that it found that for every $1 they paid to General Medicine, their managed care plan saved $2 in unnecessary health care costs.

132.   As explained in detail in Exhibit 7, beginning at page 14, General Medicine consists of board-certified physicians and masters-trained advanced nurse practitioners who specialize in providing post-acute care for patients in long-term care settings and who provide medical care exclusively to residents of post-acute facilities, including nursing homes, skilled care facilities, assisted living, congregate living, and rehab facilities.

133.   General Medicine's modern approach to providing care to long-term care residents is described in the *Geriatrics Review Syllabus* for July 2018 (Ex. 18, p. 3):

"Many physicians avoid nursing-home practice because of perceptions of excessive regulations, paperwork, limited reimbursement, and aversion to the long-term care environment. Recent data is consistent with only a minority of physicians ever billing in nursing homes (9.8%) and a small but increasing number of physicians who dedicate the majority of their practice to nursing-home medicine. In this vein and taking a lead from the recent hospitalist practice movement in acute care hospitals, formal creation of postacute and long-term care specialists (or "SNFists") has been proposed, a concept that has been put into practice in the Netherlands. Closed-staff models are thought to deliver a higher intensity and quality of care in part because of the integration of the physician into the nursing-home facility culture, which ultimately improves interdisciplinary communication and treatment. Emerging evidence suggests the quality of clinical outcomes and hospitalization rates for nursing-home residents may be lower in facilities that employ a limited number of committed physicians. In one study, physicians who spent 85% of their total practice time in nursing homes had a 50% lower rate of potentially preventable hospitalizations than those physicians devoting $\leq 5\%$ of their practice to nursing-home care."

134.   A retrospective cohort study at the Department of Internal Medicine and Sealy Center on Aging, University of Texas Medical Branch, Galveston, TX  Department of Preventive

Medicine and Community Health, University of Texas Medical Branch, Galveston, TX found that compared to patients whose PCPs (primary care physicians) devoted ≥85% clinical effort to nursing homes ( physician who specialize in nursing home medicine), patients with PCPs who provided <5% nursing home care were at 52% higher risk for potential avoidable hospitalization. In other words, physicians who do not specialize in nursing home medicine have a 52% higher rate of avoidable hospitalization for their patients.

135.    The General Medicine practitioners specialize in nursing home medicine (Post-Hospitalist Specialists) and are present in the facilities they serve on an almost daily basis.

136.    One of the goals of General Medicine is to reduce the number of expensive emergency room and hospital visits by their patients, thereby significantly reducing the cost to Medicare.

137.    For example, in 2017, the national average for a 30-day readmission rate was 22.6% while the General Medicine hospital readmission rate was only 7.7%, or about one-third (1/3) of the national average.

138.    General Medicine's dramatic reduction in hospitalizations and emergency room visits has resulted in significant savings for Medicare while, at the same time, providing better quality care for frail elderly who become confused with a change of environment.

139.    By specializing in nursing home medicine (Post-Hospitalist Specialists) and being present in the facility almost daily and providing better "hands-on" care for the residents, General Medicine practitioners are able to reduce the number of expensive emergency room and hospital visits (and ambulance costs), thus not only providing better medical care for the residents, but also saving Medicare many millions of dollars.

140.    For example, about one-half of the nursing home patients that go to the emergency room are then admitted to the hospital with an average cost of $19,000.00 per hospital admission, as compared to a cost of approximately $90 to perform a CPR or a MMR in order to avoid a hospital admission or emergency room visit.

141.    The performance of the CPRs and the MMRs helps reduce hospital admissions and emergency rooms visits, in addition to reducing the unnecessary utilization of other expensive Medicare services such as physical therapy, speech therapy, occupational therapy, and other services.

142.    Patients who no longer require skilled nursing care or nursing care will have their certification/recertification denied and will be discharged to less intensive and less expensive environments including assisted living, or home, thereby improving quality of life for the patient and saving the Government and patients massive amounts of money.

143.    The modern General Medicine specialized practice model (Post-Hospitalist Medicine Specialty) is in sharp contrast to the more-expensive conventional nursing home practice model of 25 years ago (and still, unfortunately, used in far too many long-term care facilities today) where the physician is present in the facility infrequently (with fewer billings than General Medicine), but routinely refers patients to the emergency room and the hospital at a much greater overall cost to Medicare.

144.    Typically, the nursing home physician practicing under the older conventional practice model has a busy office practice and utilizes the hospital emergency room as an outpatient clinic because the physician is not available to come to the nursing home on a regular basis, resulting in much more expensive to the Government.

13797053.1

145.    The General Medicine Post-Hospitalist practice model is in compliance with the 1993 Federal Transmittal B-93-3:

> "Keep in mind that many patients now admitted to SNFs and NFs have acute and chronic conditions of sufficient intensity to require frequent physician visits (eg., **once a week, once a day**) … Mandated medical review screens for nursing home visits and skilled nursing home visits *are inactive and may not be used. (Emphasis added).*Ex. 27.

146.    The issues with this old, more expensive, practice model, which are obviated by the General Medicine Post-Hospitalist practice model, are explained in the U.S. Department of Health and Human Services publication "*Hospitalizations of Nursing Home Residents: Background and Options*" (June 2011) (Ex. 19, p. 6):

> "Physicians play a major role in the decision to hospitalize a resident in a nursing home. Most physicians seeing residents in nursing homes have patients in multiple facilities and maintain a community practice as well. These physicians often prefer to admit residents to the hospital, rather than treat them in nursing homes for several reasons. For example, a physician may prefer to have the resident at the hospital where the physician is seeing other patients or where test results might be obtained more quickly or where higher levels of medical technology are available.
> Physician decisions regarding hospitalizations are highly dependent on communications received from the nursing home staff. First, delays in accessing the physician can result in missed opportunities to intervene early in the conditions that might have been manageable in the nursing home had intervention occurred. Second, the physician relies on information received from nursing home staff; if the staff prefer that residents be hospitalized instead of cared for in the nursing – for whatever reason – their communication with the physician will likely reflect this preference."

147.    The result of General Medicine's Post-Hospitalist practice model of having physicians/nurse practitioners in the facility on an almost daily basis is that there will be more patient encounters billed to Medicare because the patients are being seen more often than under the old model; on the other hand, the money saved by reducing expensive hospitalizations and emergency room visits by about 66% more than offsets the cost of additional encounters and includes the additional benefit of improved health of the patients.

148.     In a study of General Medicine's quality and outcomes by the University of Illinois, the General Medicine specialized practice reduced the 30-day hospital readmission rate by 56% when compared to the national average for dual-eligibles. (See attached Tab 14 — *ICI' Final 2015 Report E S).* Ex. 26. For 2017, the General Medicine hospital re-admission rate was 7.7%, while the national average for a 30-day readmission rate was 22.6%. This much lower readmission rate translates into significant savings for Medicare. This also provides better quality care for frail elderly who become confused with a change of environment.

## VIII

## GENERAL MEDICINE IS COMMITTED TO COMPLIANCE

### A.  The Voluntary Internal Compliance Program

149.     Twenty years ago, General Medicine typically invested about ½ of 1% of its gross revenue on compliance.

150.     Today, General Medicine invests about 5% of its gross revenue on compliance, a 1000% increase.

151.     General Medicine has maintained an Internal Compliance Program since 1990.

152.     General Medicine entered into a Corporate Integrity Agreement with HHS OIG in 2009, which continued for a five-year period and was successfully completed by General Medicine.

153.     Since 2014, although not required to do so, General Medicine has voluntarily continued all requirements of the CIA in the form of its Internal Compliance Program, including annual audits by an outside auditing firm and annual compliance training of all employees via CMS training modules; this voluntary compliance program is still in place and active at present.

154.    The purpose of the Internal Compliance Program is to ensure General Medicine and its employees continue to adhere to the law as directed by HHS OIG in the CIA, including billing and claims submission and medical record documentation procedures.

155.    This voluntary Internal Compliance Program mirrors the HHS OIG Model Compliance Guidance for Physician Group Practices and all HHS OIG requirements.

156.    General Medicine's goal in establishing this compliance program is to foster a culture of compliance among its employees and to prevent and detect violations of law and policy.

**B.  The Compliance File**

157.    An important component of the Internal Compliance Program is the Compliance File maintained by General Medicine relative to all of its employees.  This file currently consists of approximately 13,000 pages for the period from April 24, 1999 to the present date.  When an issue arises with respect to billing or other compliance related matters, the issue is documented in the Internal Compliance File.

158.    An example of the type of information contained in this Internal Compliance File is a situation that occurred with a clinician employed by General Medicine to see patients at its facility in Westland, Michigan.  General Medicine learned that this clinician billed for patients he did not see.  Upon learning about this, General Medicine immediately terminated the clinician from his employment and no billings of this clinician were submitted for payment.

159.    There are numerous situations documented in the 13,000 page Internal Compliance File where General Medicine swiftly took the appropriate action in response to reports of non-compliance.

## C.  Training and Education of  All General Medicine Employees

160.    An important component of the Internal Compliance Program is the mandatory training and education of General Medicine Employees, which begins at time of hire and continues on an annual basis during employment.

161.    At the time of hire, all new employees are trained by a member of the General Medicine Compliance Committee responsible for that employee's job function and are instructed on the discipline they will receive if they fail to follow compliance instructions, up to and including termination of employment.

162.    A keystone of this Internal Compliance Program is the Code of Conduct to which all employees are expected to adhere.

163.    This training and education includes specific instruction with respect to four risk areas identified in the OIG Guidance –

- Coding and billing;

- Reasonable and necessary medical services;

- Proper documentation;

- Improper inducements, kick-backs, and self-referrals.

164.    The following are examples of the CMS WBT training courses upon which General Medicine employees trained every year –

- Medicare Fraud & Abuse: Prevention, Detection, and Reporting
- Avoiding Medicare Fraud & Abuse: A Roadmap for Physicians
- Certificate of Medical Necessity Web Based Training (WBT) Course
- Diagnosis Coding Using the ICD-9-CM
-  Diagnosis Coding: Using the ICD-10-CM
- Evaluation and Management Services, addressing the rules, guidance and training regarding the evaluation and management services provided by General Medicine.

41

13797053.1

165.     General Medicine employees are trained on their obligations to report billing errors that have occurred, or are occurring, to their immediate supervisor or the Compliance Contact, who is charged with overseeing and monitoring the Internal Compliance Program for General Medicine and is also responsible for investigating reports of non-compliance.

166.     General Medicine maintains an anonymous reporting procedure for reporting violations. Employees are assured during training that they are protected from retaliation or retribution for making good faith reports of concerns they may have.

167.     All reports of violations are promptly investigated by General Medicine and appropriate action is taken. Employees are also provided with the telephone number for the HHS OIG Fraud Hotline (1-800-HHS-TIPS) for use in reporting suspected concerns about fraud or abuse in the Federal health care programs that remain unresolved through the internal process.

168.     Employees are also instructed they will be disciplined for their failure to report compliance violations that become known to them.

### D.  **Voluntary Auditing & Monitoring**

169.     General Medicine voluntarily utilizes both internal and external auditing and monitoring by an independent review organization for the purpose of ensuring compliance with laws and regulations applicable to General Medicine.

170.     This practice includes an annual comprehensive billing and reimbursement audit by an Independent External Review Organization.

171.     This practice also includes biannual audits of all clinicians by field managers and an internal auditor for compliance in coding, documentation, medical necessity of service and general adherence to CMS regulations.

13797053.1

172.    In addition, all clinicians are reviewed periodically by the Claims Transmittal Staff for quality and compliance with respect the billings and codes submitted by the clinical staff in the field.

## IX

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated herein, the CIDs should be quashed because they (1) fail to comply with § 3733's specificity requirements; (2) do not seek information reasonably relevant to an investigation and/or seek information already in possession of the USAO; (3) are overbroad and harassing; (4) were issued in bad faith; and, (5) would be an abuse of process to enforce the CIDs.

WHEREFORE, General Medicine prays as follows:

A.      That the Court enter an order setting aside the recently issued CIDs and providing direction for future CIDs consistent with that order;

B.      For such other and further relief as the Court deems appropriate.

SANDBERG PHOENIX & von GONTARD P.C.

By:      _s/ A. Courtney Cox_
         A.  Courtney Cox
         1405 West Main Street
         Carbondale, IL 62901
         618-351-7200
         618-351-7604 (Fax)
         Email: ccox@sandbergphoenix.com

         *Attorneys for General Medicine*

13797053.1

# EXHIBITS TO PETITION

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | CID to North Carolina State Veterans Home – July 2020 |
| 2 | CID to General Medicine dated 11-6-17 |
| 3 | CID to General Medicine dated 6-5-18 |
| 4 | CID to General Medicine dated 10-15-18 |
| 5 | Letter to AUSA dated 10-26-18 |
| 6 | CID to General Medicine dated 2-4-19 |
| 7 | Letter to AUSA dated 12-21-17 |
| 8 | Letter to AUSA dated 4-23-18 |
| 9 | Letter to AUSA dated 7-19-18 |
| 10 | Letter from AUSA dated 11-5-8 |
| 11 | Letter to AUSA dated 12-21-18 |
| 12 | 42 C.F.R. § 483.30  (The exhibit incorrectly show this as 483.40) |
| 13 | Excerpts from General Medicine Employee Manual |
| 14 | Medicare General Information, Eligibility, and Entitlement Chapter 4 – Physician Certification and Recertification of Services |
| 15 | OIG Special Fraud Alert January 1999 |
| 16 | "*Role of the Attending Physician in the Nursing Home*", New York State Department of Public Health |
| 17 | E-mail from AUSA of February 11, 2019 re production of records |
| 18 | Geriatrics Review Syllabus – Nursing Home Care – Updated July 2018 |
| 19 | U.S. Department of Health and Human Services publication "*Hospitalizations of Nursing Home Residents: Background and Options*" (June 2011) |
| 20 | Decision of ALJ Lewis in Appeal No. 1-45171111 |
| 21 | Letters between HCFA and General Medicine in May/June 1997 |
| 22 | Letters between HCFA and General Medicine in April 2000 |
| 23 | "*Systematic Review of the Prevalance of Medication Errors Resulting in Hospitalization and Death of Nursing Home Residents*", The American Geriatrics Society (2106) |
| 24 | *https://en.wikipedia.org/wiki/Post-hospitalist* |
| 25 | CMS Manual System – Medical Director Guidance |
| 26 | University of Illinois – *An Independent Evaluation of the Integrated Care Program* |
| 27 | HHS Transmittal B-93-3 |
| 28 | Letter to AUSA dated November 13, 2018 in Response to his November 5, 2018 letter |