IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**GENERAL MEDICINE, PC,**

Petitioner,

v.

Case No. 3:20-MC-53-NJR

**UNITED STATES OF AMERICA,**

Respondent.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Petition filed by General Medicine, PC, to set aside certain Civil Investigative Demands (CIDs) served upon nursing facilities for which General Medicine provides healthcare services (Doc. 2). The CIDs were issued by Respondent United States of America pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA), in the course of an FCA investigation (*Id.*). For the following reasons, the petition is denied.

### BACKGROUND

General Medicine, a Michigan-based company, employs physicians and nurse practitioners that specialize in the near-daily monitoring and care of post-acute patients (Doc. 2 at ¶ 1; Doc. 4). These medical professionals provide care exclusively for patients in nursing homes, skilled nursing, rehabilitation, assisted living, and other long-term care facilities (*Id.*). According to General Medicine, the U.S. Attorney's Office for the Southern District of Illinois ("the Government") has been investigating General Medicine for possible violations of the False Claims Act since at least 2015 (*Id.* at ¶ 2).

The Government seeks to determine whether General Medicine submitted false claims for payment to Medicare based on excessive, inflated, and medically unnecessary services provided to nursing facility residents (Doc. 4). Specifically, the investigation seeks to determine "whether federal insurers have paid General Medicine millions of dollars for false claims arising from excessive, medically unnecessary visits to nursing home residents." (Docs. 4; 4-1). Also being investigated is whether General Medicine knowingly upcoded claims for payment to obtain higher reimbursement, performed cursory visits with residents that did not provide any benefit or meet reimbursement requirements, and unbundled related services into multiple visits to artificially generate additional claims and revenue (*Id.*). The Government has focused its inquiry on General Medicine's Care Plan Reviews (CPRs) and Monthly Medication Reconciliations/Reviews (MMRs), which General Medicine requires its clinicians to conduct every month with every Medicare patient, regardless of the patient's need for the services (*Id.*). General Medicine also apparently bills these CPRs and MMRs at the highest reimbursement code available, which should only be used for comprehensive, complex visits (*Id.*).

During its investigation, the Government learned that "certain nursing facilities had relevant concerns about General Medicine's services, including the frequency and medical necessity of some visits" (*Id.*). The Government points to a letter from one nursing facility, in which the facility noted that it terminated its contract with General Medicine because management and the Medical Director "felt that too many unnecessary orders were being written. There would be 2 people at the facility five days a week; we felt it was too excessive." (Doc. 4-2). Based on this information, the Government issued

CIDs containing the six interrogatories to select nursing facilities likely to have recent and relevant knowledge about General Medicine's services" pursuant to 31 U.S.C. § 3733 (Doc. 4).

On July 28, 2020, General Medicine initiated this action to set aside the CIDs issued by the Government to North Carolina State Veterans Home and an unknown number of other facilities as part of its investigation (Doc. 2 at ¶ 3). The CIDs consist of six interrogatories (*Id.* at ¶ 4). Specifically, the CIDs ask the facilities to indicate: (1) the General Medicine practitioners who have provided services at the facility within the last 12 months; (2) whether the facility has received any complaints about General Medicine or a General Medicine practitioner during the past 12 months and details about the complaint(s); (3) whether resident medications are regularly reviewed for dosage, discontinuation, and/or contraindication and details about that review including General Medicine's involvement; (4) whether resident care plans are regularly reviewed and details about that review, including General Medicine's involvement; (5) whether the facility has any concern regarding General Medicine or its practitioners, including the frequency of visits, quality of care, time spent with residents, or any other concerns; and (6) the name of the person who prepared the responses or is knowledgeable about the responses (Doc. 2-2).

General Medicine argues the CIDs should be set aside because they fail to comply with the specificity requirements of 31 U.S.C § 3733, do not seek information reasonably relevant to an investigation and/or seek information already in possession of the Government, are overbroad and harassing, and were issued in bad faith. General

Medicine also asserts it would be an abuse of process to enforce the CIDs.

In response, the United States argues General Medicine has no right to set aside the CIDs under the FCA, as the statute permits only the recipient of a CID to move to set it aside (Doc. 4). Further, even if General Medicine could challenge CIDs it did not receive, the CIDs were issued in good faith, serve a legitimate purpose, and request specific information that is directly relevant and material to the investigation (*Id.*).

General Medicine asserts in reply that it has standing to challenge the CIDS. And, furthermore, the CIDs could not have been issued in good faith, considering the alleged impetus for the CIDs occurred more than a year before the CIDs were issued (Doc. 12). General Medicine also contends the Government is no longer "investigating" but conducting one-sided discovery through the irrelevant CIDs (*Id*).

In essence, General Medicine seeks to compel the Government to decide either file a False Claims Act case against it—or leave it alone. General Medicine asserts that, since the investigation began in 2015, it has lost approximately 83 percent of the facilities it served and over 70 percent of its staff (Doc. 12). Prior to the investigation, General Medicine had a less than 6 percent attrition rate per year (*Id.*). Thus, the Government continues to inflict harm on General Medicine and the patients it serves, while at the same time failing to "diligently" investigate whether a violation of the False Claims Act has occurred, as required by 31 U.S.C § 3730(a).

## LEGAL STANDARD

Under the False Claims Act, before commencing a civil proceeding under section 3730(a), the Attorney General or a designee may issue a CID to any person believed to be in possession, custody, or control of any documentary material or information relevant

to a false claims law investigation. 31 U.S.C. § 3733(a)(1). The purpose of the CID, which serves as an administrative subpoena, is to "enable the Government to determine whether enough evidence exist[s] to warrant the expense of filing [a civil] suit, as well as to prevent the potential Defendant from being dragged into court unnecessarily." *United States v. Witmer*, 835 F. Supp. 208, 211 (M.D. Pa. 1993), aff'd, 30 F.3d 1489 (3d Cir. 1994) (quoting H.R.Rep. 660, 99th Cong., 2d Sess. 26 (1986); *United States v. Markwood*, 48 F.3d 969, 975–76 (6th Cir. 1995). "Although Congress has chosen to call this subpoena by another name, a false claims CID is, at its essence, a subpoena issued by an administrative agency." *Markwood*, 48 F.3d at 796.

"[A] district court's role in the enforcement of an administrative subpoena is a limited one." *Id.* A court's "inquiry is appropriate only into whether the evidence sought is material and relevant to a lawful purpose of the agency." *E.E.O.C. v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991).

## DISCUSSION

**I.   Standing**

Before addressing whether the CIDs comply with the requirements set forth by 31 U.S.C. § 3733, the Court must determine whether General Medicine has standing to bring this action to set aside the CIDs.

The False Claims Act provides that "[a]ny person who has received a civil investigative demand . . . may file, in the district court of the United States for the judicial district within which such person resides, is found, or transacts business . . . a petition for an order of the court to modify or set aside such demand." *Id.* § 3733(j)(2). The Government argues that, because General Medicine was not the recipient of the CIDs,

under the statute it has no right to bring this action to set the CIDs aside. General Medicine disagrees, arguing that the target of an investigation has standing to challenge the validity of a subpoena on the ground that it is in excess of the terms of the applicable statute. Moreover, it argues, federal courts have inherent federal question jurisdiction to grant equitable relief against actions that exceed statutory authority.

In order to have Article III standing, a "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 134 S. Ct. 1377, 1386, 188 L. Ed. 2d 392 (2014). The Supreme Court also has recognized prudential limits on the parties that may invoke the courts' powers. Prudential standing encompasses "at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* (quotations and citations omitted).

The Government argues General Medicine is not within the zone of interests created by § 3733(j) of the FCA because it states that any person who has "received" a CID may move to have it set aside. But the statute does not *prohibit* a third party from challenging a CID, and the United States has pointed to no statute or rule that divests the Court of its authority to hear a third-party's objections to a subpoena. *See Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 305 (S.D. Ind. 2016). Indeed, as noted in

*Noble Roman's*, the only Seventh Circuit case to discuss a party's "standing" to challenge a non-party subpoena found that "[a] party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *Id.* (quoting *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982)).

Here, General Medicine has shown that it is imminently threatened with a concrete and particularized injury in fact. It states that it has lost approximately 83 percent of the facilities it served and over 70 percent of its staff since the investigation began, and one facility terminated its business relationship with General Medicine after being served with a similar CID, citing "ongoing legal proceedings" as the reason. Additionally, General Medicine notes that much of the information requested in the CIDs will have to be obtained from General Medicine and its employees. Thus, General Medicine has shown that the CIDs infringe upon its legitimate business interests such that it has standing to raise its objection in this Court.

## II.     Compliance with FCA Requirements

A district court should enforce an administrative subpoena as long as (1) the inquiry is within the authority of the agency; (2) the demand is not too indefinite; and (3) the information sought is reasonably relevant. *E.E.O.C. v. Aerotek, Inc.*, 815 F.3d 328, 333 (7th Cir. 2016). "Under this familiar formulation, known as the *Morton Salt* test, disclosure may be restricted where it would impose an unreasonable or undue burden on the party from whom production is sought." *Id.*; *see United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

General Medicine does not assert the Government's inquiry is outside its authority, but argues the CIDs are overbroad, irrelevant, and unnecessary given that it

has provided the Government with the identity of all practitioners who perform CPRs and MMRs, numerous documents explaining the services and why they are performed, and thousands of Medicare audit and Administrative Law Judge decisions. Thus, there is no need to seek the same information from the nursing facilities. General Medicine also contends the Government, rather than narrowing its years-long investigation, is now embarking on a fishing expedition by asking the facilities if they have received "any complaints" or have "any concerns" about General Medicine. *See Blue Cross, Blue Shield of Ohio v. Klein*, 117 F.3d 1420 (6th Cir. 1997) ("[W]hile substantial deference is given to CIDs and subpoenas, the government cannot merely engage in 'arbitrary fishing expeditions.'"). General Medicine argues these inquiries, in addition to being overbroad, are irrelevant to the Government's investigation, which is focused on CPRs and MMRs. Finally, General Medicine asserts the CIDs were issued in bad faith, considering the Government waited a year after obtaining certain information to send the CIDs.

In response, the Government argues that General Medicine's claim that it has acted in bad faith is unsupported and nothing more than speculation. Furthermore, it has a valid purpose for issuing the CIDs: to assess whether General Medicine submitted false, inflated claims to government insurers for medically unnecessary and excessive visits to nursing home patients. The Government further asserts that each interrogatory requests specific information that is that is relevant and material to the Government's investigation.

After reviewing the interrogatories and the scope of the Government's inquiry, the Court finds that the CIDs seek information reasonably relevant to the United States'

pending FCA investigation, are not unduly burdensome or overbroad, and do not seek information already in the Government's possession.

Interrogatory No. 1 simply asks for the names of General Medicine practitioners who have provided medical services to residents in the facility in the past 12 months. This request is limited in time and is reasonably related to the Government's investigation. While the Government may already have the names of all practitioners who perform CPRs and MMRs, this interrogatory narrows the list to those providers who, in the last 12 months, may have been involved in the activity under investigation.

Interrogatory No. 2, which asks whether the facility has received any complaints about General Medicine or a General Medicine practitioner during the past 12 months, is not limited to any specific type of complaint about General Medicine or its practitioners. As the Government explains, however, there are many different types of complaints that could relate to the purpose of its investigation—*i.e.*, "instances where General Medicine was not providing the level of service that it billed to federal insurers." (Doc. 4 at p. 12). The Government further clarifies that Interrogatories 3 and 4 seek the nursing facilities' perspective on resident care plans[1] and medication reviews, which clearly is relevant to the investigation.

Finally, Interrogatory No. 5 asks for information regarding any concerns the facility has about General Medicine or any specific General Medicine practitioners,

---

[1] General Medicine argues this question, while seemingly relevant, is actually misleading because the "resident care plans" prepared and maintained by the facility is very different from the Care Plan Reviews conducted each month by General Medicine practitioners (Doc. 12 at p. 11). The Government, in its response, however, notes that it is requesting information "from the *nursing facility* about the *nursing facility's* procedures and experiences with General Medicine." (Doc. 4 at p. 13). Given the limited role of the Court in this action, the undersigned cannot say with certainty that the question is immaterial and irrelevant to a lawful purpose of the agency. *See Aerotek, Inc.*, 815 F.3d at 333.

including any concerns about the frequency of visits, the quality of care being provided, the time spent with residents, or any other issue. Again, the Court cannot say this information is irrelevant to the Government's investigation. And because the Government is seeking the perspective of the nursing facilities, this is not information already in the Government's possession.

The Court also cannot say the CIDs issued in bad faith or that enforcing them would be an abuse of process. "[T]he party asserting that the agency acted in bad faith bears a heavy burden of proof." *Markwood*, 48 F.3d at 978 (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978)). General Medicine has not met that burden. General Medicine claims the CIDs were issued to harass and harm it and to cause it to settle a collateral dispute. It further argues the CIDs were issued after years of its cooperation with the Government, and with the Government's knowledge that the CIDs would harm its business. But General Medicine has presented no actual evidence that the CIDs were issued with the intent to harass, cause General Medicine harm, or entice it to settle some unspecified collateral dispute. Furthermore, the questions are directed to nursing facilities that have direct knowledge of General Medicine's practices. While General Medicine is understandably frustrated by the length of the investigation and the effect it is having on its business, that does not mean the CIDs were issued in bad faith.

That being said, the Court would be remiss not to express its concern regarding the length of the Government's investigation and the purported losses General Medicine has incurred as a result. "Congress intended the false claims CID to provide the

Department of Justice with a means to assess quickly, and at the least cost to the taxpayers or to the party from whom information is requested, whether grounds exist for initiating a false claim suit under 31 U.S.C. §§ 3729–32 . . . ." *Markwood*, 48 F.3d at 979. General Medicine believes the investigation has been ongoing since 2015; the Government states that it first "disclosed" to General Medicine that it was under investigation in November 2017. An investigation spanning at least three years is hardly a quick assessment. Yet, as General Medicine concedes, this is not a *qui tam* action, and the Court, of course, has no authority to compel the United States to file a False Claims Act case against it. Because the CIDs were properly issued under 31 U.S.C. § 3733, the Court must deny General Medicine's motion to set the CIDs aside. To conclude otherwise would constitute an overstep of this Court's limited authority in this action.

## Conclusion

For the reasons set forth above, the Petition filed by General Medicine, PC, to set aside certain Civil Investigative Demands (CIDs) (Doc. 2) is **DENIED**, and this action is **DISMISSED**. The Clerk of Court is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**

DATED:   December 7, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**